| | | | | |
|---|---|---|---|---|
| Minute Form (06/97) | United States District Court, Northern District of Illinois | | | *DUPLICATE ORIGINAL |
| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | | |
| CASE NUMBER | 01 C 9554 | | DATE | 2/6/2003 |
| CASE TITLE | Nijola Lileikis vs. SBC Ameritech Inc. | | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ☒ [Other docket entry] Defendant's Motion for Summary Judgment [Doc # 13] is granted. Judgment will be entered in favor of Defendant. Any and all other pending motions are moot and terminated. This case is closed.

(11) ☒ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | MAR 13 2003 | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 35 |
| | Copy to judge/magistrate judge. | | | |
| | jar/lc | courtroom deputy's initials | 03 MAR 12 PM 4: 59 U.S. DISTRICT COURT CLERK | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NIJOLA LILEIKIS )
)
) No. 01 C 9554
Plaintiff, )
) HONORABLE DAVID H. COAR
v. )
)
SBC AMERITECH, INC )
)
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendant SBC Ameritech's Motion for Summary Judgment. For the reasons set forth in this opinion, Defendant's Motion for Summary Judgment is granted.

## FINDINGS OF FACT

**DOCKETED**
**MAR 1 3 2003**

Plaintiff Nijola Lileikis ("Plaintiff" or "Lileikis") was employed by Defendant SBC Ameritech, Inc. ("Defendant" or "Ameritech") as a Directory Assistance Operator at its Network Services Business unit in Chicago Heights, Illinois. Plaintiff began working for Ameritech as a Directory Assistance Operator on June 26, 1981. The Chicago Heights office was one of six Ameritech facilities that together are responsible for providing directory assistance to 2.3 million customers a day.

Plaintiff's job consisted of sitting at a computer keyboard with a headset. She would push a button to connect with a caller, and the caller would then request a directory listing, usually a phone number. Plaintiff would provide the customer with the number and then

1

immediately take another call. Plaintiff believed that she served between 1200 and 1300 customers a day.

In the field of directory assistance, time is of the essence. If Defendant Ameritech did not provide service to callers within a set number of seconds, Ameritech could be subject to fines and penalties. According to Plaintiff's uncontested deposition testimony, she was responsible for helping customers courteously, accurately and within seven seconds, eight hours a day, five days a week.

Ameritech maintained multiple strategies to maintain full, fast service to its customer base with a minimum of operator idleness. One strategy it pursued was to offer unpaid Excused Time, or "E-time", to its operators during periods with few customer queries. At any given time, there might be full days of E-time available or there might be none at all. Plaintiff took full advantage of E-time whenver it became available. Another strategy was to offer optional overtime to its employees during periods with many customer queries. Plaintiff almost never took advantage of optional overtime when it was available.

A third strategy was to implement a fairly strict progressive discipline policy to discourage employee absenteeism. At Ameritech, employee attendance was unacceptable when chargeable absences, i.e. those not covered by paid leave, approved as a disability, or taken under the Family and Medical Leave Act, reached four days or three cases within a 12 month period. Absent employees would initially receive a warning for their absence; after the accumulation of one or more warnings, further absences within 6 months would result in a written final warning. An employee who accrued further absences within twelve months of a final warning could be suspended from work. After suspension, the company had a right to terminate an employee if

further absences occurred within twelve months. After twelve months of perfect attendance, the final warning would be cancelled for the purposes of further discipline, but it would not be expunged from the employee's record.

Plaintiff's attendance history during her employment was spotty. Lileikis received final warnings for poor attendance in 1986, 1989, 1991, and 1994. Lileikis was suspended from work for poor attendance on July 9, 1991 (one day suspension), November 26, 1991 (two day suspension), January 27, 1992 (five day suspension), August 3, 1994 (four day suspension), and in November 1997 (four and a half day suspension). Twice during her tenure, in February 1993 and September 1995, Plaintiff did have final warnings cancelled after 12 months of perfect attendance.

In late 1997 and into 1998, Plaintiff continued to struggle with her attendance. After her November 1997 suspension, Plaintiff was informed in writing that she needed to maintain six months of perfect attendance or she would be subject to further discipline. After six months of perfect attendance, Plaintiff was informed that she had been downgraded from the post-suspension level of discipline to the pre-final warning level. Shortly thereafter, on June 23, 1998, Plaintiff was again informed that her attendance record was unsatisfactory, and there would be zero tolerance for absences for six more months. In August 1998, Plaintiff was tardy for work, after which she was informed that if she was tardy twice more or had another chargeable absence, she could be subject to dismissal. On October 8, 1998, Plaintiff received a written notification from her supervisor, repeating again that Plaintiff's attendance record was poor and any further absences could result in further discipline, up to and including dismissal.

On October 15 and 16, 1998, Plaintiff was absent from work due to a migraine headache.

3

When she returned to work, Plaintiff was reminded that she could file a request for those absences to be covered by the Family and Medical Leave Act. Plaintiff submitted that she had not visited a doctor for her condition, so she could not satisfy the Ameritech policy, which required supporting medical documentation to approve requests for leave under the Family and Medical Leave Act. As a result of these absences, Plaintiff received her sixth suspension from work, this for five days.

When Plaintiff returned from her suspension, she had a post-suspension meeting with her supervisor, Gladys Hanner. Ms. Hanner reiterated the seriousness of Plaintiff's poor attendance record, and stressed that Plaintiff was required to come to work as scheduled. Between her return to work on October 27 and December 3, Plaintiff filled out a "Health Care Provider's Certificate" ("certificate") in support of a request for leave. (Pl. Dep. Ex. 18) The certificate, which Plaintiff signed on November 18, 1998, requested leave for the days she was absent with the migraine, October 15 to October 18, 1998, and from December 3, 1998 to March 3, 1998 [sic]. (Id.) The health care provider's portion of the certificate was completed by Dr. Mahim Vora.[1] (Id.) Dr. Vora indicated on the form that Plaintiff suffered from "depression, insomnia, lack of motiva[tion], lack of concentration, crying spells, [and] social withdrawal" begining in August 1998 with "duration undetermined." (Id.) Dr. Vora also indicated that Plaintiff was

---

[1]Plaintiff does not contest that the documents contained these assertions, but she does contest whether they would be admissible without Dr. Vora's deposition. In the absence of testimony, Dr. Vora's assessment of Plaintiff would be inadmissible to prove the truth of the diagnosis. In response to a motion for summary judgment, however, Plaintiff must come forward with evidence in support of her claim. Since Plaintiff would be required to prove at trial that she suffered from a qualified disability under the ADA, the Court will consider Dr. Vora's assessment as there is no other objective evidence before it. Dr. Vora's assessments will also be used to demonstrate the quantum of information available to Defendant when it made the decision to terminate Plaintiff's employment.

4

unable to perform work of any kind. (Id.)

On December 3, 1998, Plaintiff did not report to work. She telephoned that she was unable to report to work because of acute back pain. On December 4, 1998, Plaintiff filed a short term disability report via telephone with Ameritech. (Pl. Dep. Ex. 10) On December 7, 1998, Defendant mailed Plaintiff a letter detailing the policies relating to Sickness Disability benefits, which included a description of the necessary medical documentation. (Pl. Dep. Ex. 11) On January 7, 1999, Jean Ascher, a Licensed Certified Social Worker, sent further information relating to Plaintiff's condition to Defendant. The bulk of the documents were the social worker's notes, but the documents also contained a two page summary diagnosis from Dr. Mahim Vora diagnosing Plaintiff with "Major Depression, Single Episode."[2] (Pl. Dep. Ex 12) On January 27, 1999, Defendant mailed Plaintiff a letter denying her claim for Sickness Disability benefits because the medical documentation she provided did not indicate "severe impairment or reference to [her] functional capacity . . . to perform [her] occupation as an Operator with or without reasonable accommodation." (Pl. Dep. Ex 14) The letter also informed Plaintiff of her right to appeal the denial of Sickness Disability benefits. (Id.)

Plaintiff did not file an appeal of the denial of her Sickness Disability benefits. On February 22, 1999, Plaintiff spoke with her supervisor on the telephone. (Pl. Dep. Ex. 38, at D000422) Her supervisor informed Plaintiff that she had exhausted the 60 days of FMLA time

---

[2]As with Dr. Vora's assessment on the initial Health Care Provider's Certificate, Plaintiff contests the admissibility of Ms. Ascher's notes without her deposition. Again, Plaintiff would be required to prove she was disabled at trial, therefore she must come forward with sufficient evidence to defeat the summary judgment motion. Ms. Ascher's written notes will be used as evidence of Plaintiff's condition and to demonstrate the quantum of information available to Defendant at the time of Plaintiff's termination.

5

arguably available to her, and that she should keep the office informed about her plans regarding a return to work. (Id.) At some point in March, Plaintiff received a handwritten note from Dr. Vora, dated March 17, 1999, which read in its entirety: "Ms. Nijola Lileikis is under my care. In my opinion she can return to work on Part time basis on 3-22-99." (Pl. Dep. Ex 16) Though she may have spoken with her supervisor by telephone about this note, she did not submit this note to Defendant at any time. (Pl. Dep. at 99-100) On April 12, 1999, Plaintiff called her supervisor to inquire about retirement benefits. (Pl. Dep. Ex 38, at D000422) Plaintiff called her supervisor again on April 19, 1999 to learn whether she would be fired or suspended if she returned to work, as she had to return to work to be eligible for retirement benefits. (Pl. Dep. Ex 38, at D000422-D000423) Her supervisor informed her that she would not be fired if she wanted to retire, but Plaintiff assumed she would be fired if she returned to work. On July 3, 1999, Defendant mailed Plaintiff a certified letter indicating that if she did not report to work either in person or by telephone by July 30, 1999, she would be terminated. When Plaintiff did not contact the office by July 30, she was terminated, effective July 30, 1999.

On August 19, 1999, Plaintiff filed a charge of discrimination under the Americans with Disabilities Act (ADA) with the Illinois Department of Human Rights. She simultaneously filed a charge of discrimination with the EEOC. Plaintiff's attorney was out of town on March 3, 2000, the date of the scheduled hearing before the Illinois Department of Human Rights, and his written request to reset the hearing date was ignored and eventually denied. Plaintiff appeared at the hearing with her husband and a representative of her attorney, and again the request for a continuance was denied. Plaintiff refused to proceed without her attorney present and the claim was dismissed for lack of participation. Plaintiff appealed to the Chief Legal Counsel for the

Illinois Department of Human Rights, and her appeal was denied. Plaintiff then filed a notice of appeal fo the Chief Legal Counsel's decision in the Illinois Appellate Court, but Plaintiff abandoned that action in favor of a complaint in federal court, so the appeal was dismissed for want of prosecution.

On October 1, 2001, Plaintiff received a right to sue letter from the EEOC. (Pl. Dep. Ex. 3) She filed this lawsuit December 14, 2001. Defendant filed its Motion for Summary Judgment in October 2002.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure should only be granted if the evidence presented to the court in support of the motion demonstrates that there are no genuine issues of material fact to submit to a jury and the moving party is entitled to prevail as a matter of law. See Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 709 (7th Cir. 2002). To defeat the motion, the non-moving party must come forth with sufficient evidence to demonstrate the existence of a genuine issue of material fact on each of the material elements of the non-moving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("a complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial"). Where there is competing proof, the Court makes all reasonable inferences in favor of the non-moving party.

## DISCUSSION

Defendant's summary judgment motion presents two principle issuess. First, whether the determination of Plaintiff's discrimination complaint in the state system should preclude this Court's consideration of the merits of Plaintiff's federal complaint. Second, whether Defendant

is entitled to a judgment on the merits of that complaint. The Court will address each argument in turn.

I.      Whether the state court determination is entitled to preclusive effect.

Defendant has suggested that the state court determination of Plaintiff's discrimination claim should be binding on this court under the full faith and credit provisions of 28 U.S.C. § 1738. Under the full faith and credit provisions, this Court is required to give the same preclusive effect to state court judgments that those judgments would receive in the courts of the same state. See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 466 (1982). The controlling question, then, is this: what, if any, preclusive effect would the state administrative hearing followed by the state appellate court's dismissal for want of prosecution have in the Illinois state court system?

In Illinois, the doctrine of res judicata bars relitigation of claims when three requirements are met: (1) a court of competent jurisdiction has entered a final judgment on the merits; (2) the causes of action are identical; and (3) the parties are functionally identical in both causes of action. See Wenig v. Lockheed Environmental Systems & Technologies Corp., 726 N.E.2d 645, 647 (Ill. App. Ct. 2000) (citing Rein v. David A. Noyes & Co., 665 N.E.2d 1199, 1204 (Ill. 1996). Here, the causes of action on the complaint filed with the Illinois Department of Human Rights and in federal court are functionally identical, and the parties are absolutely identical. The difficulty arises in determining whether the initial state case proceeded to a final judgment on the merits.

There are several hurdles to the Defendant's characterization of the disposition of the state human rights complaint as a final judgment on the merits. First, the initial judgment on the

state court side was entered by an administrative body, not a court. In Illinois, res judicata applies to administrative determinations that are adjudicatory, judicial, or quasi-judicial in nature. See Powers v. Arachnid, Inc., 617 N.E.2d 864, 867 (Ill. App. Ct. 1993). The administrative hearings of the Illinois Department of Human Rights have most of the hallmarks of a judicial trial, including professional legal representation, the opportunity to present evidence, the opportunity to object to evidence, and final findings of fact. As such, they should be considered judicial in nature.

The hearing Plaintiff had before the Illinois Department of Human Rights in this case, however, had some significant shortcomings. First, she was not represented by counsel. She had retained an attorney for the hearings (the same attorney who represents her now), but he was unavoidably out of town on the date of the hearing. A written request for a continuance that was sent to the hearing department 27 days before the hearing went unanswered and ignored. When Plaintiff appeared at the hearing, her reiterated request for a continuance so she could appear with the benefit of counsel was denied. The position of the Department of Human Rights, apparently, is that Plaintiff's attorney never filed a notice of appearance on her complaint, therefore they did not recognize Plaintiff as a represented party. Whether they did or did not have notice of Plaintiff's attorney is a collateral matter not before this Court. What is clear is that Plaintiff elected not to present any testimony at the hearing rather than proceed at her own peril without the benefit of counsel. As a consequence, the hearing officer dismissed her complaint for lack of participation.

This leads into the second significant shortcoming of the administrative hearing: it did not produce any conclusions, legal or factual, on Plaintiff's discrimination complaint. This would

not ordinarily be a problem, as the res judicata doctrine applies with equal force to claims that *could* have been litigated to a final conclusion as it does to claims that were actually litigated. See Rein v. David A. Noyes & Co., 665 N.E.2d 1199, 1204 (Ill. 1996). In the federal courts, however, the preclusive effect of administrative agency decisions is limited to the issues of fact. See Allahar v. Zahora, 59 F.3d 693, 696 (7th Cir. 1995) ("Agency decisions may have a preclusive effect, but only in the limited area of factfinding."). Here, the dismissal of the complaint for lack of cooperation at the adminstrative level was a final determination, but the agency did not reach any conclusions as to the factual issues presented in Plaintiff's complaint to the Human Rights Department.

Defendant asserts that the appeals of that initial determination, first to the chief legal counsel of the Human Rights Department, and then to the Illinois Appellate Court, ought to foreclose further hearing of this claim in federal court. The Illinois Appellate Court dismissed Plaintiff's appeal for want of prosecution. Under Illinois law, "a dismissal for want of prosecution is ordinarily not a final order because of plaintiff's right to refile under Section 13-217 of the Code of Civil Procedure." Allstate Ins. Co. v. Andersen, 768 N.E.2d 329, 331 (Ill. App. Ct. 2002). This seemingly straightforward procedural rule is not easily applied to the circumstances of this case.

As a preliminary matter, the Illinois Supreme Court declared Section 13-217 of the Illinois Code of Civil Procedure (along with the rest of the 1995 civil procedure amendments) to be unconstitutional in 1997. See Best v. Taylor Mach. Works, 689 N.E.2d 1057 (Ill. 1997); see also Hurst v. Capital Cities Media, Inc., 754 N.E.2d 429 (Ill. App. Ct. 2001). The decision in Best voids all the 1995 amendments, so the previous version of the statute, 735 ILCS 5/13-217

(West 1994), governs. The previous version of the statute permitted the Plaintiff "one and only one refiling of an action" after a voluntary dismissal for want of prosecution. Hurst v. Capital Cities Media, Inc., 754 N.E.2d at 438. If the rule applies, then Plaintiff would have one opportunity to refile the claim within one year after the dismissal for want of prosecution.

It is not at all clear that this procedural rule, which Plaintiff seeks to apply, applies to rulings of the appellate court. The rule that a dismissal for want of prosecution is not a final order primarily dictates the appeal rights of the Plaintiff who suffered the dismissal. See, e.g., Wilson v. Evanston Hosp., 629 N.E.2d 589, 591 (Ill. App. Ct. 1994) ("There is no question that in the State of Illinois the dismissal of a case for want of prosecution is not a final order *for appeal purposes* because plaintiffs have an absolute right to refile the cause of action within one year of the dismissal.") (emphasis added). If the rule applied directly on appeal, the appellate court ruling would not preclude Plaintiff's complaint in this case, as Plaintiff filed her federal complaint within one year of the date that the Illinois Appellate Court dismissed her appeal for want of prosecution.[3] But this Court is not at all convinced that this rule, which Plaintiff seeks to apply, applies directly to dismissals at the appellate level.

In the usual course, any dismissal at the appellate level could only occur after a determination on the merits of the claim in the lower courts. The Illinois rule permitting refiling after the dismissal for want of prosecution makes sense at the level of the trial court, as it would mitigate the harsh effects of the dismissal on plaintiffs. At the appellate level, plaintiffs who fail to pursue their appeals are not in the same position as those who, for whatever reason, neglect

---

[3] The Illinois Appellate Court dismissed her appeal on August 9, 2001. She filed her federal complaint on December 14, 2001.

11

their complaint at the trial court level.

In this case, although Plaintiff suffered a dismissal for want of prosecution at the appellate level, her position more closely resembles a plaintiff whose claim was dismissed at the trial level. No court or administrative body has yet made any determination on the underlying merits of her discrimination complaint. As is becoming clear, this is an unusual case.

There are two somewhat similar cases that provide guidance for the Court's determination of this issue: one comes from the Seventh Circuit and one comes from the Illinois court system. In both cases, the plaintiff pursued relief in the state and federal systems. In both cases, the complaint in one of the systems was dismissed for want of prosecution. And in both cases, the previous case did not preclude a holding on the merits in the subsequent case. In the Seventh Circuit case of <u>Allahar v. Zahora</u>, 59 F.3d 693 (7th Cir. 1995), the plaintiff had dual filed complaints with the EEOC and the Illinois Department of Human Rights, as did Plaintiff Lileikis. There, the Seventh Circuit did not find the claim precluded. In so doing, the court noted that the "dismissal was certainly not based on the merits of the case nor did any factfinding occur at that juncture." <u>Allahar</u>, 59 F.3d at 696. In the Illinois case, <u>Wenig v. Lockheed Environmental Systems & Tech. Co.</u>, 726 N.E.2d 645 (Ill. App. Ct. 2000), plaintiff filed a complaint with a federal administrative law judge that he was fired in retaliation for reporting under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Rather than pursuing his complaint in the federal system, the plaintiff in <u>Wenig</u> sought relief in the state courts. In deciding that the previous judgment should not have preclusive effect, the Illinois court noted that "the dismissal of plaintiff's Department proceeding was not the result of a hearing on the merits or factfinding by the ALJ, but the result of Plaintiff's

12

efforts to withdraw his Department proceeding so he could proceed... in the state circuit court." Wenig, 726 N.E.2d at 649.

One critical difference between those two cases and this case is that here, Plaintiff did have a scheduled hearing on the merits before the Illinois Department of Human Rights. The hearing, as noted above, did not result in any factfinding. This Court finds that Plaintiff's lack of participation in the hearing under the circumstances was reasonable. Furthermore, if Plaintiff had pursued her state court appeal to its completion, it is probable that the Illinois appellate court would agree. See Kessling v. U.S. Cheerleaders Ass'n, 574 N.E.2d 1370, 1371 (Ill. App. Ct. 1991) (holding that a trial court abused its discretion to dismiss a complaint for want of prosecution on the sole basis that plaintiff's attorney was not present at a status hearing). This Court holds that it is unlikely that the Illinois courts would give preclusive effect to the determination of Plaintiff's state discrimination complaint, with all its irregularities. Consequently, it will not be given preclusive effect here.

## II. Whether Plaintiff can proceed to trial on her discrimination claim.

In order to sustain her claim of discrimination based on her disability, Plaintiff must prove three things: (1) that she is disabled within the meaning of the Americans with Disabilities Act (ADA); (2) that she is qualified to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 950 (7th Cir. 2000). The Court only needs to review the evidence as to the first and third element of the claim.

### A. Is Plaintiff disabled within the meaning of the ADA?

Plaintiff must demonstrate that there is a genuine issue of material fact as to whether she

13

is a qualified individual with a disability under the terms of the Americans with Disabilities Act (ADA). Defendant contends that the Plaintiff is not disabled within the meaning of the ADA. Major depression can constitute a disability under the ADA, see Ogborn v. United Food & Commercial Workers Union, Local No. 881, 305 F.3d 763, 767 (7th Cir. 2002), but in order to qualify, the major depression must substantially limit the major life activities of the Plaintiff. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). Here, Plaintiff suggests that her disability substantially limits her ability to perform her job.

The Supreme Court suggested a cautious approach when the major life activity alleged to be substantially limited is that of working. Sutton v. United Air Lines, Inc., 527 U.S. at 492 ("[T]here may be some conceptual difficulty in defining 'major life activities' to include work.... Indeed, even the EEOC has expressed reluctance to define 'major life activities' to include working...."). In order to meet the statutory definition of disability, Plaintiff must, "at a minimum" "allege that [she is] unable to work in a broad class of jobs." Sutton, 527 U.S. at 491. According to federal regulations, "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

The evidence in this case overwhelmingly demonstrates that Plaintiff was emotionally incapable of performing her job as a directory assistance operator. The notes of her sessions with her social worker and her psychiatrist demonstrate Plaintiff's unhappiness with her job. The social worker's initial interview notes that Plaintiff "is stressed at work and at home... [She] hates her job, but needs to stay for the insurance." (Pl. Dep. Ex. 12) In the psychiatrists's description of her "presenting problem," he writes, "Her job is very stressful. She does not like

14

her job. She gets along well with her co-workers and there are no interpersonal problems at job." (Pl. Dep. Ex. 12) By January 6, 1998, Plaintiff had not been to work for over a month. According to the social worker's notes from an interview on that date, Plaintiff was already reporting that she felt better: "she feels less depressed and can even joke and laugh." (Pl. Dep. Ex 12) During her deposition, Plaintiff affirmed that she told her social worker during that interview that she would "rather commit suicide than return to work." (Pl. Dep. at 92) She made it clear that she had no intention nor desire to return to work for Defendant.

Plaintiff has not demonstrated a genuine issue of material fact as to whether her depression constituted a disability under the ADA. The evidence before the Court demonstrates convincingly that Plaintiff despised her job, but it does not demonstrate that Plaintiff was disabled within the meaning of the ADA. There is no evidence that Plaintiff would have been unable to perform any other job due to her depression. The Court is sensitive to the crippling capacity of depression as a disability, but on the record before it, it does not appear that Plaintiff's depression crippled her ability to do anything but work as a directory assistance operator. Working as a directory assistance operator is a high stress occupation that would clearly require a great deal of patience, skill, and endurance. It seems that Plaintiff's reserves of those qualities may have expired after seventeen years. While for Plaintiff, that is regrettable, it does not constitute a disability under the ADA. On this basis alone, Defendant would be entitled to Summary Judgment.

**B.     Did Plaintiff suffer an adverse employment action because of her disability?**

As the Court has already determined that Plaintiff did not have a disability within the meaning of the ADA, any adverse employment action that Plaintiff suffered could not have been

15

because of her disability in violation of the ADA. The Court addresses this element of Plaintiff's case, however, to demonstrate that even if Plaintiff were disabled within the meaning of the ADA, there is no genuine issue of material fact as to whether she suffered an adverse employment action on that basis.

As detailed above in the recitation of facts, Plaintiff's attendance record at work was spotty for virtually her entire seventeen year tenure at Ameritech. Plaintiff asserts that she believed that prior attendance problems were expunged after six or twelve months of perfect attendance. Ameritech's policy was to allow six or twelve months of perfect attendance to diminish the level of discipline that employees would receive for further violations, but there is no evidence that Ameritech indicated to its employees that past violations would be completely expunged from their employment record.

For almost eight months preceding her termination from Ameritech, Plaintiff did not report to work. In the months preceding her lengthy unauthorized absence, she was suspended for the sixth time for missing work. Plaintiff had been told repeatedly in person and in writing that her attendance pattern was unacceptable. During her unauthorized absence, Plaintiff did file a claim for disability benefits, a claim which was reasonably denied on the supporting evidence that Plaintiff conveyed to Ameritech. Plaintiff was informed, in writing, of her rights to appeal the denial of disability benefits. Plaintiff did not appeal. Nor did she return to work. Even if Plaintiff's claim had been granted, by its terms, her request for disability leave would have lapsed in March 1999. Plaintiff believed that if she did return to work, she probably would have been fired. Fear of termination does not justify a failure to report to work. Under the circumstances, Defendant Ameritech gave Plaintiff ample opportunity to return to work to discuss the options

16

available to her. When Plaintiff never did return to work, they fired her almost eight months after she stopped reporting to work.

Plaintiff asserts that she had a note from her psychiatrist indicating that she could return to work part-time in March 1998. If she were disabled, under some circumstances, this could be a reasonable accommodation. Plaintiff, however, never submitted this handwritten note to her employer. Having never received the note, Defendant cannot be expected to make an assessment of whether this was a reasonable accommodation.

Claiming a disability does not afford employees the unilateral right to set the terms of their employment and eventual return to work. Here, Plaintiff filed a disability claim. After the claim was denied, Plaintiff did nothing. She did not appeal, she did not return to work, she did not submit supplementary documentation detailing her disability. Defendant Ameritech's decision to terminate her employment in July 1998 was imminently reasonable, and it was unrelated to her disability claim.

## CONCLUSION

For the reasons stated in this opinion, Defendant's Motion for Summary Judgment is granted. Judgment will be entered in favor of Defendant Ameritech.

Enter:

_____
David H. Coar
United States District Judge